# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

ORIGINAL

RECEIVED 13 2002 CLERK, U.S. DISTRICT COURT NORTHERN DISTRICT OF TEXAS

**I. (a) PLAINTIFFS**
MARISHA PATEL, On Behalf of Herself and All Others and all others similarly situated,

**DEFENDANTS**
HALLIBURTON COMPANY, DAVID J. LESAR, GARY V. MORRIS, RICHARDS MUCHMORE, JR., AND DOUGLAS L. FOSHEE.

(b) County of Residence of First Listed Plaintiff Milwaukee
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant Dallas
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

(c) Attorney's (Firm Name, Address, and Telephone Number)
Theodore C. Anderson
Kilgore & Kilgore PLLC, 3131 McKinney Ave., Suite 700 Dallas,
(214) 969-9099 tele (214) 953-0133 - facsimile
Stanley Grossman, Pomerantz HaudekBlock Grossman & Gross, 100 Park Ave. - 26th Fl New York, NY 10017

Attorneys (If Known)

3-02CV 1238L

**II. BASIS OF JURISDICTION** (Place an "X" in One Box Only)

- ☐ 1 U.S. Government Plaintiff
- (X) 3 Federal Question (U.S. Government Not a Party)
- ☐ 2 U.S. Government Defendant
- ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** (Place an "X" in One Box for Plaintiff and One Box for Defendant) (For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | (X) | Incorporated or Principal Place of Business In This State | ☐ 4 | X 4 |
| Citizen of Another State | (X) 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. NATURE OF SUIT** (Place an "X" in One Box Only)

**CONTRACT**
- ☐ 110 Insurance
- ☐ 120 Marine
- ☐ 130 Miller Act
- ☐ 140 Negotiable Instrument
- ☐ 150 Recovery of Overpayment & Enforcement of Judgment
- ☐ 151 Medicare Act
- ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans)
- ☐ 153 Recovery of Overpayment of Veteran's Benefits
- ☐ 160 Stockholders' Suits
- ☐ 190 Other Contract
- ☐ 195 Contract Product Liability

**TORTS**

PERSONAL INJURY
- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel & Slander
- ☐ 330 Federal Employers' Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☐ 360 Other Personal Injury

PERSONAL INJURY
- ☐ 362 Personal Injury— Med. Malpractice
- ☐ 365 Personal Injury — Product Liability
- ☐ 368 Asbestos Personal Injury Product Liability

PERSONAL PROPERTY
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

**FORFEITURE/PENALTY**
- ☐ 610 Agriculture
- ☐ 620 Other Food & Drug
- ☐ 625 Drug Related Seizure of Property 21 USC
- ☐ 630 Liquor Laws
- ☐ 640 R.R. & Truck
- ☐ 650 Airline Regs
- ☐ 660 Occupational Safety/Health
- ☐ 690 Other

**BANKRUPTCY**
- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal 28 USC 157

**PROPERTY RIGHTS**
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 840 Trademark

**OTHER STATUTES**
- ☐ 400 State Reapportionment
- ☐ 410 Antitrust
- ☐ 430 Banks and Banking
- ☐ 450 Commerce/ICC Rates/etc
- ☐ 460 Deportation
- ☐ 470 Racketeer Influenced and Corrupt Organizations
- ☐ 810 Selective Service
- (X) 850 Securities/Commodities/ Exchange
- ☐ 875 Customer Challenge 12 USC 3410
- ☐ 891 Agricultural Acts
- ☐ 892 Economic Stabilization Act
- ☐ 893 Environmental Matters
- ☐ 894 Energy Allocation Act
- ☐ 895 Freedom of Information Act
- ☐ 900 Appeal of Fee Determination Under Equal Access to Justice
- ☐ 950 Constitutionality of State Statutes
- ☐ 890 Other Statutory Actions

**LABOR**
- ☐ 710 Fair Labor Standards Act
- ☐ 720 Labor/Mgmt. Relations
- ☐ 730 Labor/Mgmt Reporting & Disclosure Act
- ☐ 740 Railway Labor Act
- ☐ 790 Other Labor Litigation
- ☐ 791 Empl. Ret. Inc. Security Act

**SOCIAL SECURITY**
- ☐ 861 HIA (1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g))
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g))

**FEDERAL TAX SUITS**
- ☐ 870 Taxes (U.S. Plaintiff or Defendant)
- ☐ 871 IRS—Third Party 26 USC 7609

**REAL PROPERTY**
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

**CIVIL RIGHTS**
- ☐ 441 Voting
- ☐ 442 Employment
- ☐ 443 Housing/ Accommodations
- ☐ 444 Welfare
- ☐ 440 Other Civil Rights

**PRISONER PETITIONS**
- ☐ 510 Motions to Vacate Sentence Habeas Corpus
- ☐ 530 General
- ☐ 535 Death Penalty
- ☐ 540 Mandamus & Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Condition

**V. ORIGIN** (PLACE AN "X" IN ONE BOX ONLY)

(X) 1 Original Proceeding ☐ 2 Removed from State Court ☐ 3 Remanded from Appellate Court ☐ 4 Reinstated or Reopened ☐ 5 Transferred from another district (specify) ☐ 6 Multidistrict Litigation ☐ 7 Appeal to District Judge from Magistrate Judgment

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write brief statement of cause. Do not cite jurisdictional statutes unless diversity.)

VIOLATIONS OF FEDERAL SECURITIES LAWS PURSUANT TO 15 USC 78 J (b) 78 T (a)

**VII. REQUESTED IN COMPLAINT:** ☑ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23 **DEMAND $** CHECK YES only if demanded in complaint **JURY DEMAND:** x Yes ☐ No

**VIII. RELATED CASE(S) IF ANY** (See instructions): JUDGE ______ DOCKET NUMBER ______

DATE 6/13/02 SIGNATURE OF ATTORNEY OF RECORD Theodore C. Anderson

FOR OFFICE USE ONLY

RECEIPT # ______ AMOUNT ______ APPLYING IFP ______ JUDGE ______ MAG. JUDGE ______

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FILED
JUN 13 2002
CLERK, U.S. DISTRICT COURT
By ________
Deputy

ORIGINAL

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| MANISHA PATEL, On Behalf of Herself And All Others Similarly Situated,<br><br>Plaintiff,<br><br>-against-<br><br>HALLIBURTON COMPANY, DAVID J. LESAR, GARY V. MORRIS, R. CHARLES MUCHMORE, JR., and DOUGLAS L. FOSHEE,<br><br>Defendants. | Civil Action No.<br><br>3-02CV 1238L<br><br>**JURY TRIAL DEMANDED** |

**FEDERAL SECURITIES**
**CLASS ACTON COMPLAINT**

Plaintiffs, by her undersigned attorneys, for her Class Action Complaint allege, upon personal knowledge as to herself and her own acts, and upon information and belief based, *inter alia*, on the investigation conducted by their attorneys and their staffs, including reviews and analyses of public filings with the Securities and Exchange Commission (the "SEC"), securities analyst and debt rating agency reports, press releases, news articles, and other media reports as to all other matters, as follows:

**NATURE OF THE ACTION**

1. This is a securities class action on behalf of purchasers of the common stock of Halliburton Company ("Halliburton" or the "Company") between July 22, 1999, and May 28, 2002, both dates inclusive (the "Class Period"). Named as defendants are Halliburton Company, David

J. Lesar, Gary V. Morris, R. Charles Muchmore, Jr., and Douglas L. Foshee. The case involves a series of public statements regarding Halliburton's earnings, revenue and financial results.

2. During the Class Period, the defendants caused the Company to improperly recognize revenues in connection with Halliburton's long-term construction projects in violation of Generally Accepted Accounting Principles ("GAAP"). Commencing at least as early as the fourth quarter of fiscal1998, the Company amended its accounting policies to report an approximately $89 million of revenues to cover disputed cost overruns on long-term construction projects. The Company assumed that its customers would pay the disputed amounts, but never disclosed the change in accounting or the assumption of payment to the market.

3. GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time. Regulation S-X (17 C.F.R. §210.4-01(a)(1)) states that financial statements filed with the SEC which are not prepared in accordance with GAAP are presumed to be misleading and inaccurate. Regulation S-X also requires that interim financial statements comply with GAAP. 17 C.F.R § 210.10-01 (a).

4. For fiscal years 1999, 2000, and 2001, the Company reported unbilled receivables of $98 million, $113 million and $234 million, respectively. The unbilled receivables were based on the same undisclosed assumption of payment, in violation of GAAP because payment of the receivables was not probable and the amounts could not be estimated with the requisite reliability.

5. On May 28, 2002, Halliburton disclosed that the SEC had begun "a preliminary investigation of the Company's accounting treatment of cost overruns on construction jobs." Over the next two weeks, the stock lost 15% of its value as it fell from a closing price of $19.35 on May

28, 2002, to a closing price of $16.49 on June 11, 2002 – a loss of $2.86 per share.

## JURISDICTION AND VENUE

6. This court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C.§78aa, and 28 U.S.C. §1331.

7. The claims asserted herein arise under Sections 10(b), and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the Securities and Exchange Commission (the "SEC"), 17 C.F.R. 240.10b-5.

8. Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. §1391(b) and (c). The principal executive offices of Halliburton are located in this District, the defendants transact business in this District, and many of the acts and transactions constituting the violations of law alleged herein, including the preparation, issuance and dissemination of materially false and misleading statements to the investing public, occurred in this District.

9. In connection with the acts, conduct and other wrongs alleged herein, defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including the United States mails, interstate telephone communications, and national securities markets.

## THE PARTIES

### Plaintiff

10. Plaintiff Manisha Patel purchased shares of Halliburton common stock during the Class Period, as represented in her Certification, attached as **Exhbit A** and was damaged thereby.

### Defendants

11. Defendant Halliburton is a Delaware corporation with its executive offices and

principle place of business located at 3600 Lincoln Plaza, 500 North Akard Street, Dallas, Texas. The Company provides a variety of services, products, maintenance, engineering and construction services to energy, industrial and governmental customers through two business segments, the Energy Services Group (which provides services and products for the exploration, development and production of oil and gas) and the Engineering and Construction Group (which provides engineering and construction services to energy, industrial and governmental customers).

12. Defendant David J. Lesar ("Lesar") has been Chairman of the Board, President and Chief Executive Officer of Halliburton since August, 2000. From May 1997 to August 2000, Lesar was President and Chief Operating Officer of Halliburton.

13. Defendant Gary V. Morris ("Morris") was Executive Vice President and Chief Financial Officer of Halliburton from May 1997 to August 2001. Since August 2001, Morris has been Executive Vice President of Halliburton.

14. Defendant R. Charles Muchmore, Jr. ("Muchmore") has been Vice President, Controller, and Principal Accounting Officer of Halliburton since August 1996.

15. Defendant Douglas L. Foshee ("Foshee") has been Executive Vice President and Chief Financial Officer of Halliburton since August 2001.

16. Defendants Lesar, Morris, Muchmore and Foshee are collectively referred to herein as the Individual Defendants. Because of the Individual Defendants' positions within the Company, they had access to adverse undisclosed information about its business, operations, products, operational trends, financial statements, markets, and business prospects. They were privy to such undisclosed information from internal corporate documents, communications with other

officers and employees of the Company, and attendance at and documents received during management and Board of Directors meetings.

17. The Individual Defendants, as officers and/or directors of the Company had a duty, because of the positions they held, to disseminate complete, accurate, and truthful information about Halliburton's financial condition and business operations. The Individual Defendants had a duty to correct promptly any public statements issued by Halliburton that had become false and misleading. Because of their positions, their ability to exercise power and influence with respect to Halliburton's course of conduct, and their access to material inside information about Halliburton, the Individual Defendants were, at the time of the wrongs alleged herein, controlling persons within the meaning of Section 20(a) of the Exchange Act.

18. It is appropriate to treat the Individual Defendants as a group for pleading purposes and to presume that the false, misleading and/or incomplete information conveyed in the Company's public filings, press releases and other publications as alleged herein are the collective action of the Individual Defendants identified above.

## CLASS ACTION ALLEGATIONS

19. Plaintiff brings this action as a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of a class consisting of all persons and entities who purchased the common stock of Halliburton between July 22, 1999 and May 28, 2002 (both dates inclusive), and were damaged thereby ("the Class"). Excluded from the Class are defendants herein, officers and directors of Halliburton, members of their immediate families, and the heirs, successors or assigns of any of the foregoing.

20. The members of the Class are so numerous that joinder of all members is

impracticable. While the exact number of Class members is unknown to the plaintiff at this time and can only be ascertained through appropriate discovery, the plaintiff believes there are, at a minimum, thousands of members of the Class who purchased Halliburton common stock during the Class Period. There are approximately 435 million shares of Halliburton common stock outstanding, which securities traded in an open and efficient market on the New York Stock Exchange under the symbol "HAL."

21. Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by defendants' acts as alleged herein;
- whether Halliburton issued false and misleading financial statements during the Class Period;
- whether the Individual Defendants caused Halliburton to issue false and misleading financial statements during the Class Period;
- whether defendants acted knowingly or recklessly in issuing false and misleading financial statements;
- whether the market prices of Halliburton securities during the Class Period were artificially inflated because of the defendants' conduct complained of herein; and
- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

22. Plaintiff's claims are typical of the claims of the members of the Class as plaintiff and members of the Class sustained damages arising out of defendants' wrongful conduct in violation of federal law as complained of herein.

23. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class actions and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

24. A class action is superior to other available methods for the fair and efficient adjudication of the controversy since joinder of all members of the Class is impracticable. Furthermore, because the damages suffered by the individual Class members may be relatively small, the expense and burden of individual litigation makes it impracticable for the Class members individually to redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

25. Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- defendants made public misrepresentations or failed to disclose material facts during the Class Period;
- the omissions and misrepresentations were material;
- the securities of the Company traded in an efficient market;
- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and
- plaintiff and members of the Class purchased their Halliburton stock between the time the defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

26. Based upon the foregoing, all purchasers of Halliburton securities during the Class Period suffered similar injury through their purchase of the securities at artificially inflated prices

and a presumption of reliance applies.

## SUBSTANTIVE ALLEGATIONS

### Background

27. In early May, 2002, with the markets in turmoil over the high profile accounting debacles at Enron and Global Crossing, the criminal indictment and break-up of the "big-five" accounting firm Andersen LLP, congressional oversight committees investigating accounting rules and issuing subpoenae to obtain documents from the Vice President's meetings with energy industry executives, and the reports of the manipulation of the price of energy in California by energy companies, the national and financial press started to report on the accounting at another energy company – Halliburton.

28. On May 22, 2002, *The New York Times* reported on Halliburton's amended accounting policy noting that at the time of the change, the Company was suffering from large losses on some of its long-term construction contracts and was under pressure to increase revenues in the face of falling stock prices and a perceived recession in the oil industry. According to the article, former executives of Dresser Industries, Inc. ("Dresser Industries") (acquired by Halliburton during the third quarter of 1998) stated that the accounting policy was changed to "obscure" Halliburton "losses":

> Two former executives of Dresser Industries, which merged with Halliburton in 1998, said that they concluded after the merger that Halliburton had instituted aggressive accounting practices to obscure its losses.

29. The article explained the former accounting policy within the context of Halliburton's business and reported:

> Much of Halliburton's business comes from big construction projects, like

> natural gas processing plants, which sometimes ran over budget. With the policy change, Halliburton began to book revenue on the assumption that its customers would pay at least part of the cost overruns, although they remained in dispute. Before 1998, the company had been more conservative, reporting revenue from overruns only after settling with its customers.

Although Halliburton's Chief Financial Officer, Foshee, reportedly offered such an accounting explanation for the new aggressive policy:

> Though resolving such disputes can take months or years, the company decided it was reasonable to recognize at least part of the revenue from the claims even while they remained in dispute, [Halliburton CFO] Foshee said.

The article responded to the Company's position by noting that the former Dresser Industries executives continued to maintain:

> that the company made the accounting change to obscure large losses on several important construction contracts.

30. The article also reported that the accounting change was approved by the Company's independent auditor, Andersen LLP, as well as by defendant Lesar.

**The Materially False And Misleading Statements**

31. On July 22, 1999, Halliburton issued a press release announcing financial results for the fiscal quarter of 1999, ended June 30, 1999, which reported "net income was $83 million ($.19 per share diluted) compared to $243 million ($.55 per share diluted) earned in the 1998 second quarter."

32. On August 13, 1999, Halliburton filed its Form 10-Q for the second quarter of 1999, ended June 30, with the SEC. The Form 10-Q repeated the financial information announced in the press release on July 22, 1999, and stated:

> The accompanying unaudited condensed consolidated financial statements were prepared using generally accepted accounting principles for interim financial information and the

> instructions to form 10-Q and applicable rules of Regulation S-X. Accordingly, these financial statements do not include all information and footnotes required by generally accepted accounting principles for complete financial statements and should be read in conjunction with our 1998 Annual Report on Form 10-K.
>
> In our opinion, the condensed consolidated financial statements present fairly our financial position as of June 30, 1999, and the results of our operations for the three and six months ended June 30, 1999, and our cash flows for the six months then ended.

The Form 10-Q was signed by defendants Morris and Muchmore.

33. On October 21, 1999, Halliburton issued a press release announcing financial results for the third quarter of 1999, ended September 30, 1999, which reported "net income was $58 million ($ .13 per share diluted) compared to a loss of $527 million ($1.20 per share diluted) in the 1998 third quarter."

34. On November 15, 1999, Halliburton filed its Form 10-Q for the third quarter of 1999, ended September 30, 1999, with the SEC. The Form 10-Q repeated the financial information announced in the press release on October 21, 1999, and stated:

> The accompanying unaudited condensed consolidated financial statements were prepared using generally accepted accounting principles for interim financial information and the instructions to form 10-Q and applicable rules of Regulation S-X. Accordingly, these financial statements do not include all information and footnotes required by generally accepted accounting principles for complete financial statements and should be read in conjunction with our 1998 Annual Report on Form 10-K.
>
> In our opinion, the condensed consolidated financial statements present fairly our financial position as of September 30, 1999, and the results of our operations for the three and nine months ended September 30, 1999, and our cash flows for the nine months then ended.

The Form 10-Q was signed by defendants Morris and Muchmore.

35. On January 27, 2000, Halliburton issued a press release announcing financial results for the fourth quarter and year ended December 31, 1999, which reported "net income of $235 million ($.53 per share diluted), which included an extraordinary gain of $159 million net of taxes ($.36 per share diluted) on the sale of Halliburton's 49 percent interest in Ingersoll-Dresser Pump. Excluding the extraordinary gain, Halliburton's 1999 fourth quarter operating income was $76 million ($.17 per share diluted) compared to $58 million ($.13 per share diluted) in the 1999 third quarter and $66 million ($.15 per share diluted) in the year ago quarter."

36. On March 14, 2000, Halliburton filed its Form 10-K for the fourth quarter and year ended December 31, 1999, with the SEC. The Form 10-K repeated the financial information announced in the press release on January 27, 2000, and stated:

> Revenues and income recognition. We recognize revenues as services are rendered or products are shipped. The distinction between services and product sales is based upon the overall activity of the particular business operation. Revenues from engineering and construction contracts are reported on the percentage of completion method of accounting using measurements of progress towards completion appropriate for the work performed. All known or anticipated losses on contracts are provided for currently. Claims and change orders which are in the process of being negotiated with customers, for extra work or changes in the scope of the work are included in revenue when collection is deemed probable.

The Form 10-K also stated that claims and change orders included in unbilled receivables amounted to $98 million and $89 million at December 31, 1999 and 1998 respectively and were generally expected to be collected in the following year. The Form 10-K was signed by defendants Morris and Muchmore.

37. On April 26, 2000, Halliburton issued a press release announcing financial results for the first quarter of 2000, ended March 31, 2000, which reported "net income of $264 million, or

$ .59 per share diluted. These amounts include an after-tax gain of $215 million, or $ .48 per share diluted, on the February sale of the company's 51 percent equity interest in the segment's Dresser-Rand joint venture. Excluding that gain, net income was $49 million or $ .11 per share diluted."

38. On May 15, 2000, Halliburton filed its Form 10-Q for the first quarter of 2000, ended March 31, 2000, with the SEC. The Form 10-Q repeated the financial information announced in the press release dated April 26, 2000, and stated:

> The accompanying unaudited condensed consolidated financial statements were prepared using generally accepted accounting principles for interim financial information and the instructions to form 10-Q and applicable rules of Regulation S-X. Accordingly, these financial statements do not include all information and footnotes required by generally accepted accounting principles for complete financial statements and should be read in conjunction with our 1999 Annual Report on Form 10-K.
>
> In our opinion, the condensed consolidated financial statements present fairly our financial position as of March 31, 2000, and the results of our operations for the three months ended March 31, 2000 and 1999 our cash flows for the three months then ended.

The Form 10-Q was signed by defendants Morris and Muchmore.

39. On July 26, 2000, Halliburton issued a press release announcing financial results for the second quarter of 2000, ended June 30, 2000, which reported "net income was $75 million ($0.17 per share diluted) compared to $83 million ($0.19 per share diluted) in the 1999 second quarter."

40. On August 10, 2000, Halliburton filed its Form 10-Q for the second quarter of 2000, ended June 30, 2000, with the SEC. The Form 10-Q repeated the financial information announced in the press release dated July 26, 2000, and stated:

> The accompanying unaudited condensed consolidated

> financial statements were prepared using generally accepted accounting principles for interim financial information and the instructions to form 10-Q and applicable rules of Regulation S-X. Accordingly, these financial statements do not include all information and footnotes required by generally accepted accounting principles for complete financial statements and should be read in conjunction with our 1999 Annual Report on Form 10-K. Prior year amounts have been reclassified to conform to the current year presentation.
>
> In our opinion, the condensed consolidated financial statements present fairly our financial position as of June 30, 2000, and the results of our operations for the three and six months ended June 30, 2000 and 1999 and our cash flows for the six months then ended.

The Form 10-Q was signed by defendants Morris and Muchmore.

41. On October 24, 2000, Halliburton issued a press release announcing financial results for the third quarter of 2000, ended September 30, 2000, which reported "net income was $157 million ($0.35 per share diluted), representing a 109 percent increase over the prior quarter, and 171 percent increase compared to the third quarter 1999."

42. On November 9, 2000, the Company filed a Form 10-Q for the third quarter of 2000, ended September 30, 2000, with the SEC. The Form 10-Q repeated the financial information announced in the press release dated October 24, 2000, and stated:

> The accompanying unaudited condensed consolidated financial statements were prepared using generally accepted accounting principles for interim financial information and the instructions to form 10-Q and applicable rules of Regulation S-X. Accordingly, these financial statements do not include all information and footnotes required by generally accepted accounting principles for complete financial statements and should be read in conjunction with our 1999 Annual Report on Form 10-K. Prior year amounts have been reclassified to conform to the current year presentation.
>
> In our opinion, the condensed consolidated financial statements present fairly our financial position as of September 30,

> 2000, and the results of our operations for the three and nine months ended September 30, 2000 and 1999 and our cash flows for the nine months then ended.

The Form 10-Q was signed by defendants Morris and Muchmore.

43. On January 30, 2001, Halliburton issued a press release announcing financial results for the fourth quarter and year ended December 31, 2000, which reported

> net income was $123 million ($0.28 per diluted share) before charges related to its engineering and construction business of $118 million, net of taxes ($0.27 per diluted share). The $123 million is an increase of 62 percent compared to 1999 fourth quarter net income before gain on sale of discontinued operations of $76 million ($0.17 per diluted share) and an increase of 19 percent compared to 2000 third quarter net income before gain on sale of vessels of $103 million ($0.17 per diluted share). Including the engineering and construction charges, 2000 fourth quarter net income was $5 million ($0.01 per diluted share).

44. On March 27, 2001, Halliburton filed its Form 10-K for the fourth quarter and year ended December 31, 2000, with the SEC. The Form 10-K repeated the financial information in the press release dated January 30, 2001, and stated:

> Revenues and income recognition. We recognize revenues as services are rendered or products are shipped. The distinction between services and product sales is based upon the overall activity of the particular business operation. Revenues from engineering and construction contracts are reported on the percentage of completion method of accounting using measurements of progress towards completion appropriate for the work performed. All known or anticipated losses on contracts are provided for currently. Claims and change orders which are in the process of being negotiated with customers, for extra work or changes in the scope of the work are included in revenue when collection is deemed probable.

The Form 10-K also stated that claims and change orders included in unbilled receivables amounted to $113 million and $98 million at December 31, 2000 and 1999 respectively and were generally

expected to be collected in the following year. The Form 10-K was signed by defendants Lesar, Morris and Muchmore.

45. On April 25, 2001, Halliburton issued a press release announcing financial results for the first quarter of 2001, ended March 31, 2001, which reported:

> net income was $109 million ($0.25 per diluted share). Net income from continuing operation was $86 million an increase of 219 percent over the prior year quarter.

46. On May 11, 2001, Halliburton filed its Form 10-Q for the first quarter of 2001, ended March 31, 2001, with the SEC. The Form 10-Q repeated the financial information in the press release dated April 26, 2001, and stated:

> The accompanying unaudited condensed consolidated financial statements were prepared using generally accepted accounting principles for interim financial information and the instructions to form 10-Q and applicable rules of Regulation S-X. Accordingly, these financial statements do not include all information and footnotes required by generally accepted accounting principles for complete financial statements and should be read in conjunction with our 2000 Annual Report on Form 10-K. Prior year amounts have been reclassified to conform to the current year presentation.
>
> In our opinion, the condensed consolidated financial statements present fairly our financial position as of March 31, 2001, and the results of our operations for the three months ended March 31,2001 and 2000 and our cash flows for the three months then ended.

The Form 10-Q was signed by defendants Morris and Muchmore.

47. In a July 25, 2001, Halliburton issued a press release announcing financial results for the second quarter of 2001, ended June 30, 2001, which reported:

> net income was $382 million ($0.89 per diluted share). Net income from continuing operations was $143 million ($0.33 per diluted share), an increase of 175 percent compared to the prior quarter.

> Revenues from continuing operations were $3.3 billion in the 2001 second quarter, an increase of 16 percent compared to the year ago quarter. Operating income of $272 million for the quarter represents an increase of $126 million. The company's strong growth was driven by continued strong performance in the Energy Services Group.

48. On August 9, 2001, Halliburton filed its Form 10-Q for the second quarter of 2001, ended June 30, 2001, with the SEC. The Form 10-Q repeated the financial information in the press release dated July 25, 2001, and stated:

> The accompanying unaudited condensed consolidated financial statements were prepared using generally accepted accounting principles for interim financial information and the instructions to form 10-Q and applicable rules of Regulation S-X. Accordingly, these financial statements do not include all information and footnotes required by generally accepted accounting principles for complete financial statements and should be read in conjunction with our 2000 Annual Report on Form 10-K. Prior year amounts have been reclassified to conform with the current presentation.
>
> In our opinion, the condensed consolidated financial statements present fairly our financial position as of June 30, 2001, and the results of our operations for the three and six months ended June 30, 2001 and 2000 and our cash flows for the six months then ended.

The Form 10-Q was signed by defendants Morris and Muchmore.

49. On October 23, 2001, Halliburton issued a press release announcing financial results for the third quarter of 2001, ended September 30, 2001, which reported:

> net income of $179 million ($0.42 per diluted share). Net income from continuing operations was $181 million ($0.42 per diluted share), an increase of 39 percent over the prior year quarter and the highest earnings since the merger with Dresser was completed in 1998.
>
> Revenues from continuing operations were $3.4 billion in the 2001 third quarter, an increase of 12 percent compared to the year ago

> quarter. Operating income of $342 million for the quarter represents an increase of 38 percent compared to the 2000 third quarter operating income of $248 million. Excluding a non-recurring gain in the 200 third quarter, operating income more than doubled. Compared to the 2001 second quarter, operating income increased $70 million on increased revenues of $52 million. Both the Energy Services Group and Engineering and Construction Group contributed to these improved results.

50. On November 8, 2001, Halliburton filed its Form 10-Q for the third quarter of 2001, ended September 30, 2001, with the SEC. The Form 10-Q repeated the financial information in the press release dated October 23, 2001, and stated:

> The accompanying unaudited condensed consolidated financial statements were prepared using generally accepted accounting principles for interim financial information and the instructions to form 10-Q and applicable rules of Regulation S-X. Accordingly, these financial statements do not include all information and footnotes required by generally accepted accounting principles for complete financial statements and should be read in conjunction with our 2000 Annual Report on Form 10-K. Prior year amounts have been reclassified to conform to the current year presentation.
>
> In our opinion, the condensed consolidated financial statements present fairly our financial position as of September 30, 2001, and the results of our operations for the three and nine months ended September 30, 2001 and 2000 and our cash flows for the nine months then ended.

The Form 10-Q was signed by defendants Foshee and Muchmore.

51. On January 23, 2002, Halliburton issued a press release announcing financial results for the fourth quarter and year ended December 31, 2001, which reported:

> 2001 fourth quarter net income from continuing operations of $141 million ($0.33 per diluted share) and $551 million ($1.28 per diluted share) for the full year. Total net income was $139 million ($0.32 per diluted share) for the 2001 fourth quarter. Discontinued operations for the 2001 fourth quarter included $2 million after-tax asbestos-related expenses ($0.01 per diluted share.)

> Revenues from continuing operations were $3.2 billion in the 2001 fourth quarter, essentially the same as a year ago. Operating income of $272 million for the quarter was up significantly over last year. Compared to the record 2001 third quarter, revenues and operating income decreased by $219 million and $70 million, respectively, due to softening petroleum industry conditions.

52. On March 12, 2002, Halliburton filed its Form 10-K for the fourth quarter and year ended December 31, 2001, with the SEC. The form 10-K repeated the financial information in the press release dated January 23, 2002, and stated:

> Revenues and income recognition. We recognize revenues as services are rendered or products are shipped. The distinction between services and product sales is based on the overall activity of the particular business operation. Revenues from engineering and construction contracts are reported on the percentage of completion method of accounting using measurements of progress towards completion appropriate for the work performed. Progress is generally based upon physical progress, man-hours or costs incurred based upon the appropriate method for the type of job. All known or anticipated losses on contracts are provided for currently. Claims and change orders which are in the process of being negotiated with customers, for extra work or changes in the scope of work are, included in revenue when collection is deemed probable.

The Form 10-K also stated that claims and change orders included in unbilled receivables amounted to $234 million and $113 million at December 31, 2001 and 2000 respectively. The Form 10-K was signed by defendants Lesar, Foshee and Muchmore.

53. Halliburton's representations referenced in paragraphs 31-52, above, which cite the Company's reported financial results during the Class Period, were materially false and misleading when made. The defendants – in violation of GAAP – improperly recognized revenue in 1999 by as much as $98 million, in 2000 by as much as $113 million, and in 2001 by as much as $234. The defendants also failed to disclose – in violation of GAAP – that Halliburton had made

a change in accounting principles governing the recognition of revenue from its construction projects. Furthermore, the statements in the Company's Form 10-Q's and From 10-K's filed with the SEC during the Class Period and referenced above, which stated that the financials were complete and in compliance with GAAP, were false and/or misleading when made.

**The Revelation**

54. On May 28, 2002, Halliburton issued a press release announcing that the SEC had begun "a preliminary investigation of the Company's accounting treatment of cost overruns on construction jobs" and that the Company "expect[ed] to receive a formal request for documents or a subpoena in the next few days." The press release add:

> The Company believes that this investigation results from an article in the New York Times on May 22, 2002, in which certain allegations were reported concerning the Company's accounting treatment of construction job claims and change orders which are negotiated with customers. Prior to 1998 and the merger with Dresser, the Company did not record such items in revenue or accounts receivable before they were resolved with the customer.

Since the announcement, the stock has dropped 15%, from $19.35 per share to $16.49 per share on May 28, 2002, on June 11, 2002.

**GAAP Violations**

55. Defendants' undisclosed accounting change violated GAAP and marked a serious departure from both the Company's long held accounting policies, as well as general industry wide practice. Statement of Position ("SOP") 81-1, governs the accounting for long-term construction contracts, and provides, in pertinent part:

> Claims are amounts in excess of the agreed contract price (or amounts not included in the original contract price) that a contractor seeks to collect from customers or others for customer-caused delays, errors

> in specifications and designs, contract terminations, change orders in dispute or unapproved as to both scope and price, or other causes of unanticipated additional costs. Recognition of amounts of additional contract revenue relating to claims is appropriate only if it is probable that the claim will result in additional contract revenue and if the amount can be reliably estimated.

56. The effect of the Company's change to its accounting policy resulted in a material inflation Halliburton's revenues and earnings during the Class Period. In the fourth quarter of 1998, the Company reported $175 million of pre-tax operating profits. Had the Company followed its prior policy, more than half of the 4Q'98 reported profits would not have been recognized. That is, the cost overruns associated with various construction projects would not have been recognized as revenue, but as losses. The Company would not have recognized any revenue from such cost overruns absent an agreement with its clients to pay Halliburton additional monies to cover the overrun, *i.e.*, disputed claims or change orders.

57. The change of accounting principle and failure to disclose said change also violated Accounting Principles Board ("APB") No. 20, which states, in pertinent part:

> The Board concludes that in the preparation of financial statements there is a presumption that an accounting principle once adopted should not be changed in accounting for events and transactions of a similar type. Consistent use of accounting principles from one accounting period to another enhances the utility of financial statements to users by facilitating analysis and understanding of comparative accounting data.
>
> The presumption that an entity should not change an accounting principle may be overcome only if the enterprise justifies the use of an alternative acceptable accounting principle on the basis that it is preferable.

APB No. 20 further directs disclose of any such change:

> The nature and justification for a change in accounting principle and its effect on income should be disclosed in the financial statements of the period in which the change is made. The justification for the change should explain clearly why the newly adopted accounting principle is preferable.

APB No. 20 also requires a company making a change in accounting principle to disclose "[t]he effect of adopting the new accounting principle on income."

58. APB No. 20 defines a change in accounting principle, *inter alia*, to include a change in the method of applying a particular accounting principle:

> A change in accounting principle results from adoption of a generally accepted accounting principle different from the one used previously for reporting purposes. The term accounting principle includes not only accounting principles and practices but also the methods of applying them.
>
> . . . .
>
> Changes in accounting principle are numerous and varied. They include . . . a change in the method of accounting for long-term construction-type contracts . . . .

Halliburton's change in accounting principle was not disclosed or justified by the in any the Company or Individual Defendants in any public document during the Class Period.

## CLAIMS FOR RELIEF

## COUNT I

(Violations Of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)

59. Plaintiff repeats and restates each and every allegation contained above as if fully set forth herein.

60. During the Class Period, Defendants carried out a plan, scheme and course of

conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Halliburton's securities; and (iii) cause plaintiff and other members of the Class to purchase Halliburton's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendant took the actions set forth herein.

61. Defendant: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Halliburton's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5.

62. In addition to the duties of full disclosure imposed on defendant as a result of its making of affirmative statements and reports to the investing public, defendant had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC as embodied in SEC Regulation S-X (17 C.F.R. Sections 210.01 et seq.) and Regulation S-K (17 C.F.R. Sections 229.10 et seq.) and other SEC regulations, including accurate and truthful information with respect to the Company's operations, financial condition and earnings so that the market price of the Company's securities would be based on truthful, complete and accurate information.

63. Defendants, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about its business, operations and future prospects as

specified herein.

64. Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Halliburton's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Halliburton and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Halliburton's securities during the Class Period.

65. Defendant's material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Halliburton's operating condition and future business prospects from the investing public and supporting the artificially inflated price of its securities.

66. The defendants were motivated to make the undisclosed accounting change as, *inter alia*, the Company was faced with lower oil prices which resulted in a net loss of $14.7 million for the fiscal year ended December 31, 1998, as compared to net gain in income of $722.4 million for the prior fiscal year. Further, prior to the change in accounting during the third quarter of fiscal1998, Halliburton completed the acquisition of Dresser, which added additional liabilities to the Company due to asbestos-related lawsuits filed against Dresser.

67. As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Halliburton's securities

was artificially inflated during the Class Period. In ignorance of the fact that market prices of Halliburton's publicly-traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by defendant, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by defendant but not disclosed
in public statements by defendant during the Class Period, plaintiff and the other members of the Class acquired Halliburton securities during the Class Period at artificially high prices and were damaged thereby.

68. At the time of said misrepresentations and omissions, plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had plaintiff and the other members of the Class and the marketplace known of the true financial condition and business prospects of Halliburton, which were not disclosed by defendant, plaintiff and other members of the Class would not have purchased or otherwise acquired their Halliburton securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

69. By virtue of the foregoing, defendant has violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

70. As a direct and proximate result of defendant's wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

**COUNT II**

(Violations of Section 20(a) of the

Exchange Act Against the Individual Defendants)

71. Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

72. (a) During the Class Period, Defendant Lesar participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of Lesar's senior positions, he knew the adverse non-public information about the Company's business operations and false statements.

(b) As an officer and director of a publicly traded company, Lesar had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and business operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

(c) Because of his position of control and authority as a senior officer of the Company, Lesar was able to, and did, control the contents of press releases which the Company disseminated in the marketplace during the Class Period concerning the Company's business operations and financial condition. Throughout the Class Period, Lesar exercised his power and authority to cause the Company to engage in the wrongful acts complained of herein. Lesar, therefore, was a "controlling person" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, he participated in the unlawful conduct alleged which artificially inflated the market price of the Company's securities.

73. (a) During the Class Period, Defendant Morris participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of Morris's senior positions, he knew the

adverse non-public information about the Company's business operations and false statements.

(b) As an officer of a publicly traded company, Morris had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and business operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

(c) Because of his position of control and authority as a senior officer of the Company, Morris was able to, and did, control the contents of press releases which the Company disseminated in the marketplace during the Class Period concerning the Company's business operations and financial condition. Throughout the Class Period, Morris exercised his power and authority to cause the Company to engage in the wrongful acts complained of herein. Morris, therefore, was a "controlling person" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, he participated in the unlawful conduct alleged which artificially inflated the market price of the Company's securities.

74. (a) During the Class Period, Defendant Foshee participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of Foshee's senior positions, he knew the adverse non-public information about the Company's business operations and false statements.

(b) As an officer of a publicly traded company, Foshee had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and business operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

(c) Because of his position of control and authority as a senior officer of the

Company, Foshee was able to, and did, control the contents of press releases which the Company disseminated in the marketplace during the Class Period concerning the Company's business operations. Throughout the Class Period, Foshee exercised his power and authority to cause the Company to engage in the wrongful acts complained of herein. Foshee, therefore, was a "controlling person" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, he participated in the unlawful conduct alleged which artificially inflated the market price of the Company's securities.

75. (a) During the Class Period, Defendant Muchmore participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of Muchmore's senior positions, he knew the adverse non-public information about the Company's business operations and false statements.

(b) As an officer of a publicly traded company, Muchmore had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and business operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

(c) Because of his position of control and authority as a senior officer of the Company, Muchmore was able to, and did, control the contents of press releases which the Company disseminated in the marketplace during the Class Period concerning the Company's business operations. Throughout the Class Period, Muchmore exercised his power and authority to cause the Company to engage in the wrongful acts complained of herein. Muchmore, therefore, was a "controlling person" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, he participated in the unlawful conduct alleged which artificially inflated the market

price of the Company's securities.

76. The Individual Defendants, therefore, acted as controlling persons of the Company. By reason of their senior management positions and/or as directors of the Company, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, the Company to engage in the unlawful acts and conduct complained of herein. The Individual Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which plaintiff and the other members of the Class complain.

77. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20 of the Exchange Act for the violations of the Company.

**WHEREFORE**, plaintiff pray for relief and judgment, as follows:

A. determining that this action is a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff Class Representatives under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

B. awarding compensatory damages in favor of plaintiff and the other class members against defendant for all damages sustained as a result of defendant's wrongdoing, in an amount to be proven at trial, including pre-judgment and post-judgment interest thereon;

C. awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D. such other and further relief as the Court may deem just and proper.

Dated: June 13, 2002

Respectfully submitted,

KILGORE & KILGORE, PLLC

By: Theodore C Anderson by TCA
THEODORE C. ANDERSON
State Bar No. 01215700

3131 McKinney Ave., Suite 700 - LB 103
Dallas, Texas 75204
(214) 969-9099 - Telephone
(214) 953-0133 - Fax

Stanley M. Grossman
Marc I. Gross
POMERANTZ HAUDEK BLOCK
GROSSMAN & GROSS LLP
100 Park Avenue – 26th Floor
New York, New York 10017
Telephone: 212-661-1100
Facsimile: 212-661-8665

Patrick V. Dahlstrom
POMERANTZ HAUDEK BLOCK
GROSSMAN & GROSS LLP
One North LaSalle Street, Suite 2225
Chicago, Illinois 60602
Telephone: 312-377-1181
Facsimile: 312-377-1184

Richard J. Vita
THE LAW OFFICES OF RICHARD J. VITA, P.C.
77 Franklin Street, Suite 300
Boston, Massachusetts 02110
Telephone: 617- 426-6566
Facsimile: 617-357-1612

**Attorneys for Plaintiff**